E-FILED
Tuesday, 24 July, 2007  12:49:05 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SHARON K. DICKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3310 |
| | ) | |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Sharon Dickey (Dickey) appeals from a final decision of the Social Security Administration (SSA) denying her application for disability insurance benefits (DIB) under §§ 216(I) and 223 of the Social Security Act, 42 U.S.C. §§ 416(I), 423.  Dickey brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Plaintiff's Motion for Summary Judgment (d/e 8)</u>; <u>Defendant's Motion for Summary Affirmance (d/e 11)</u>.  For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence.

Defendant's Motion for Summary Affirmance is therefore allowed, and Dickey's Motion for Summary Judgment is denied.

STATEMENT OF FACTS

A.    MEDICAL HISTORY

Dickey was born on July 17, 1948.  She has a high school education, and in the past she has worked as a sales clerk, an assembler, and a cashier. In October 2000, Dickey suffered trauma in a motor vehicle accident.  X-rays following the accident revealed degenerative problems with Dickey's cervical spine.  Dickey complained of pain in her right wrist after the accident and was referred to Dr. Bradon Wilhelmi, a plastic surgeon. Dickey saw Dr. Wilhelmi on November 7, 2000.  He concluded that Dickey had radial wrist pain, which was most likely the result of arthritis and "a possible partial scapholunate tear." Administrative Record (d/e 6) (A.R.) at 162.  Dr. Wilhelmi ordered further evaluation in the form of a bone scan, placed Dickey in a splint, and began administering a nonsteroidal agent. Dr. Wilhelmi prohibited Dickey from working for at least three months, but noted that if her symptoms improved he would release her to return to work.

Results of an MRI scan revealed that Dickey did indeed have a

scapholunate ligament tear.   On January 5, 2001, Dr. Wilhelmi recommended surgery to repair the tear.  A.R. at 170.  After being informed of the risks of the procedure, Dickey consented to surgery.  Dr. Wilhelmi certified that Dickey would be unable to work for at least one month after surgery.  Id. at 171.  On January 9, 2001, Dr. Wilhelmi noted a date of surgery of January 25, 2001, commenting that Dickey would be in a cast for approximately three months following surgery, which would result in one-handed work for twelve weeks following surgery.  Id. at 172.

The surgery was performed on January 25, 2001.  A.R. at 201-02.  By April 25, 2001, Dickey's cast had been removed.  On that date, Dr. Wilhelmi noted a full active range of motion in Dickey's fingers.  Id. at 180.  Dickey was directed to undergo occupational therapy and to wear a splint at night and for daytime protection.  Dr. Wilhelmi saw Dickey again on May 23, 2001.  Id. at 184.  At that point, Dickey had no complaints and reported complete resolution of her pain.  Dr. Wilhelmi released Dickey to work at her request.

Dr. Wilhelmi saw Dickey again in July 2002.  A.R. at 186.  Dickey reported no complaints other than occasional pain with excessive strenuous work.  Dickey did inform Dr. Wilhelmi, however, that she had to change

jobs because the work load at her prior job caused her pain.  After examining

Dickey, Dr. Wilhelmi concluded that clinically Dickey had done well

following the surgery.  He informed her that she may have some arthritis in

the wrist.

In October 2002, Dickey was seen by Dr. Gordon Allan for right knee

problems.  A.R. at 187.  Dr. Allan noted a history of contusion following the

2000 automobile accident.  Dickey reported that she had been having more

trouble in the last six months.  According to Dickey, the distal lateral aspect

of her thigh was sore and tingly and seemed to be getting worse with time.

After examining Dickey, Dr. Allan noted "an indurated area of what appears

to be fatty tissue on her distal thigh" that was somewhat tender.  Id.  Dr.

Allan doubted that this was a neoplasm, but ordered an MRI.

Dickey returned to see Dr. Allan on November 15, 2002, after the

MRI was performed.  A.R. at 188.  The MRI confirmed Dr. Allan's opinion

that there was no serious tumor.   Dr. Allan opined that he could not

imagine doing anything surgical.  Dr. Allan noted, "I am sure she thinks

standing on it all day long at her job at Wal-Mart aggravates the situation.

She is interested in changing jobs, so she has a more sedentary type of job."

Id.  Dr. Allan prescribed 500 mg of Naprosyn twice a day to take "the edge

off of this situation." Id.

In September 2003, Dickey underwent an internal medical examination with Dr. Phillip Budzenski, a consultant for social security. A.R. at 231-235.  Dr. Budzenski noted that Dickey was right-hand dominant.  He administered dynamometer testing.  Id. at 234.  Using her right hand, Dickey was able to generate 10 kg of force with the short grip, 11 kg of force with the medium grip, and 8 kg of force with the wide grip. Using her left hand, Dickey was able to generate 17 kg of force with the short grip, 23 kg of force with the medium grip, and 20 kg of force with the wide grip.  Dr. Budzenski noted that Dickey gave "fair effort on the dynamometer testing."  Id.  He also noted that "[s]ubjective grip strength testing was somewhat higher than that seen by dynamometer bilaterally." Id. Dr. Budzenski subjectively assessed Dickey's grip strength as five out of five bilaterally.  Dr. Budzenski concluded his report by noting as follows:

> With regard to the right hand injury, claimant notes that the thumb was the most affected.  She has very excellent range of motion.  She has no atrophy in her hands.  She notes that she can have some increased pain with squeezing hard, which probably explains her decreased dynamometer grip strength measurements on the right hand.
>
> With the right thigh tenderness, there is no change in her ability to ambulate.  The tenderness likely affects her internal rotation

of the hip.

> With regard to the mild degenerative joint disease of the right knee, claimant is not taking any medication for arthritis-type pain.  She notes that her weight does affect her knee.

Id. at 235.

Dr. Budzenski noted that Dickey was 5'3" tall and weighed 211.5 pounds.  A.R. at 232.  The record contains a Physical Residual Functional Capacity Assessment (Assessment) prepared by state medical examiners.  Id. at 262-69.  The Assessment noted Dickey's exertional limitations as follows: occasionally lift and/or carry twenty pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and unlimited pushing and/or pulling.  Id. at 263.  The report noted no manipulative, visual, communicative, or environmental limitations.

In October 2003, Dickey was diagnosed with recurrent major depressive disorder by the Counseling Center of Pike County.  A.R. at 250-52.   Dickey reported that her attention was "distractible" and her concentration was "preoccupied."  Id. at 251.  Dickey's husband confirmed that she seemed forgetful and was distracted a lot.  Dickey's Global

Assessment of Functioning (GAF) score was 50.[1]  The intake coordinator recommended individual and family counseling for 6 to 9 months and medication management.   Dickey was referred to a psychiatrist, Dr. Woerner, who placed her on an antidepressant.  Id. at 255.  At a follow-up appointment in March 2004, Dr. Woerner noted that Dickey reported she was "doing fairly well.  Mood continues to be reasonably good."  Id. at 259. At a July 2004 follow-up, Dickey reported that she was sleeping longer at night and felt calmer during the day with increased energy.  Id. at 260.  At an October 2004 follow-up, Dickey's husband reported that she was "very stressed over her health and finances."  Id. at 261.  Dickey reported that her mood has been pretty good most of the time.  However, she did complain of leg pain and numb hands.  Dr. Woerner suggested that Dickey take ibuprofen for the pain.

In the spring of 2004, Dickey was also seen by doctors at the Pittsfield Rural Health Clinic and chiropractor Jeff King, D.C.  On March 4, 2004, she was seen by Dr. Amelia Dean at the Rural Health Clinic because of

---

[1]GAF is an assessment of an individual's overall level of psychological, social and occupational functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32 (4th ed. 2000).  Scores range from 0 to 100, with lower numbers indicating more severe mental limitations.  A GAF of 50 indicates serious problems with social or occupational functioning.  Id. at 34.

complaints of "low back pain particularly over the left sacral area." <u>A.R.</u> at 219.  Dr. Dean found that Dickey had point tenderness, but maintained full range of motion.   Dr. Dean recommended that Dickey use Tylenol or Tylenol Arthritis and ice.  She also gave Dickey stretching exercises and a back book.

On May 1, 2004, Dickey presented to the emergency room at Illini Community Hospital complaining of chest pain, numbness, and headache. <u>A.R.</u> at 271.  The doctor noted no active pulmonary disease.  <u>Id</u>.  Dickey saw Dr. Dean again on May 6, 2004, complaining of neck pain and back spasms.  <u>Id</u>. at 220.  Dr. Dean strongly advised Dickey to start an exercise program of walking fifteen minutes a day.  <u>Id</u>.  A cervical spine examination at Illini Community Hospital on May 7, 2004 revealed no appreciable change from an October 2000 examination.  <u>Id</u>. at 272.  The doctor did note "C5-C6 disc narrowing with mild osteophytic encroachments on the neuroforamina for the 6th nerve root on the left."  <u>Id</u>.  However, the doctor noted that there were no acute findings.  <u>Id</u>.

On May 14, 2004, Dickey presented to Jeff King, D.C., complaining of "severe neck and shoulder pain steadily worsening over the past two weeks with bilateral pain and weakness into the upper extremities." <u>A.R.</u> at

8

294.  Dr. King noted that Dickey visibly exhibited stiffness and discomfort. Id.  Standard minimal radiographic examination "revealed a reversal of the cervical curve with reactive sclerosis of the involved end plates with facet hypertrophy at the level of the lower cervical spine . . . ." Id.  Dr. King's clinical impression was as follows: "degenerative disc disease of the cervical spine complicated by fibrotic contractile tissues paravertebrally resultant from trauma related to a motor vehicle accident in 2000." Id.

In late 2004, Dickey developed asthmatic bronchitis, for which she received repeated treatment.  A.R. at 284-90.  During this time, she also exhibited point tenderness in her mid-back for which she was prescribed Ultram, an opioid pain reliever.  Id. at 288.  While Dickey continued to complain of back pain in mid-January 2005, she reported that the Ultram was helping.  Id. at 290.  A January 13, 2005, x-ray of Dickey's lumbar spine revealed "[s]light degenerative changes, mainly in the mid thoracic spine with no acute findings." Id. at 277.

B.    ADMINISTRATIVE HEARING

Dickey filed her application for DIB on August 1, 2003, asserting that she became disabled on July 30, 2001.  Her claim was denied initially and on reconsideration.  Dickey requested an administrative hearing, which was

held April 27, 2005.  At the hearing, Dickey was allowed to amend her claimed onset date to April 1, 2003.  <u>A.R.</u> at 303-04.  The Administrative Law Judge (ALJ) heard testimony from Dickey, her husband Gerald Dickey (Gerald), and vocational expert J. Stephen Dolan.

Dickey testified that she lived in a mobile home with her husband Gerald.  She stated that she last worked in a part-time cashier position at Wal-Mart from September 2001 until April 2003.  According to Dickey, she quit her cashier job because, when she stood, she experienced pain in her right leg that extended into her back.  Dickey testified that, prior to her employment as a cashier at Wal-Mart, she worked as an assembler at a brake plant for approximately seven years.  Dickey explained that she left the assembler job after injuring her right wrist in an automobile accident.  According to Dickey, she returned to work after injuring her wrist; however, she could not do the work because it required her to push with her right hand, which she could not do.  Dickey stated that, prior to the assembler job, she worked as a sales clerk at Wal-Mart from 1989 to 1994.  According to Dickey, Gerald receives Social Security disability benefits, which is the family's sole source of income.

Dickey testified that she was currently taking Lexapro for depression

but that she had stopped attending counseling because she could no longer afford it.  In order to continue receiving her medication, however, Dickey stated that she did continue to see a psychiatrist every six months or so. Dickey testified that she was also taking prescription medication for high blood pressure and high cholesterol as well as a prescription sleeping pill.

When questioned about her current capabilities, Dickey testified that she could lift a gallon of milk in each hand and could lift a 24-pack of soda using both hands.  Dickey stated that she did not think that she could lift a bag of dog food.  When asked whether she could pick up two gallons of milk from the floor, one in each hand, and place them on a table, Dickey stated that she could but it would be "harder."  <u>A.R.</u> at 327.  Dickey testified that she could not do something like this for an hour or two a day or her back would hurt.  Dickey testified that she could stand comfortably for approximately thirty minutes before needing to sit.  According to Dickey, her leg sometimes bothered her while she was sitting.

Dickey testified that since she had stopped working, she usually wakes up between 5:30 and 6:30 a.m. because her daughter brings Dickey's three grandchildren over for Dickey to care for them.  According to Dickey, the oldest child is eleven.  Dickey stated that she watched the eleven year old

until the child boarded the school bus at 8:00 a.m.  Dickey testified that the

other  grandchildren are five-year-old twins.  Dickey stated that she cared

for them until they got on a school bus at noon and that she usually fixed

them a little lunch before they left.  Dickey testified that she would rest, and

sometimes sleep, in the afternoons after the kids got on the bus.  According

to Dickey, Gerald would help her care for the grandchildren.

With respect to household chores, Dickey testified that her husband

does most of the work that "requires a lot of effort."  <u>A.R.</u> at 316.  Dickey

stated that she vacuums on occasion and does most of the laundry.  Dickey

stated that she can dress herself and take care of her personal needs, "unless

it is something that requires fastening in the back."  <u>Id.</u> at 320.  Dickey

further testified that she likes to read, do crossword puzzles, and cross-

stitch.  According to Dickey, she also tries to garden; however, she can only

work ten or fifteen minutes before she is forced to stop.  Dickey stated that

she does the grocery shopping "if there's just a little bit to get."  <u>Id.</u> at 321.

However, Dickey testified that "[i]f there's a lot of shopping to do, [her]

husband does it."  <u>Id</u>.

Dickey testified that she visited the emergency room in 2004 because

she believed that she was having a heart attack.  According to Dickey, an x-

ray revealed that her pain resulted from a degenerated disc in her neck. Dickey testified that she has headaches almost every day, which she believes are caused by the degenerated disc.  Dickey stated that she also visited the emergency room in the winter before the administrative hearing because she was having trouble breathing.  According to Dickey, the doctors determined that she had bronchitis and ordered a nebulizer, which she used until Easter 2005.

Gerald Dickey testified that he and Dickey worked together at the brake factory.  Gerald stated that at that time, Dickey "was very active, mobile, alert, and fully capable of doing anything and everything that a person would normally be able to do." A.R. at 332.  He characterized her energy level at that point as "very good." Id. at 332-33.  In contrast, Gerald described Dickey's current energy level as "poor." Id. at 333.  According to Gerald, Dickey's "entire demeanor has pretty much slowed down" and "[i]t takes her a long time to do anything." Id.  Gerald reiterated Dickey's limitations with household chores.

Vocational expert Dolan testified regarding Dickey's past relevant work experience.  According to Dolan, Dickey's first job at Wal-Mart, as a sales attendant, was light, unskilled work, while her job at the brake factory

13

was unskilled with a light exertional level as defined by the Department of Labor, but a medium exertional level as Dickey described it. Dolan testified that the more recent cashier position at Wal-Mart was semi-skilled work with an exertional level of light, as defined by the Department of Labor, but medium exertion as described by Dickey.

The ALJ asked Dolan to assume a hypothetical individual of Dickey's age, education, and work experience who could lift twenty pounds on occasion and ten pounds frequently, stand and/or walk at least six hours in an eight hour work day, sit at least six hours, and occasionally climb ramps and stairs. The ALJ asked whether such an individual, if restricted to simple and/or repetitive work, could perform any of Dickey's past relevant work. Dolan testified that such an individual could work as a sales attendant. He further testified that such an individual could work as an assembler and a cashier/checker as described in the regulations, but not in these positions as described by Dickey. The ALJ then added additional limitations as follows: assume that the individual "could only occasionally balance, stoop, kneel, crouch, or crawl, and could not work above shoulder level with the left upper extremity, and would have to avoid concentrated exposure to fumes, odors, dust, gasses, poor ventilation, things of that sort." A.R. at 339.

Dolan testified that these additional restrictions would eliminate the assembler job, but not the other occupations. Dolan further testified that, if the individual was unable to stand for at least six hours out of an eight-hour workday, it would preclude all of Dickey's past relevant work. Upon examination by Dickey's attorney, Dolan testified that an individual who was able to use her hands to grasp or finger for only five or six hours in a work day would not be able to perform any of Dickey's past relevant work. Furthermore, Dolan stated that an individual with a moderate impairment in the ability to focus her concentration and attention would not be able to perform the cashier or sales attendant jobs or any unskilled entry level work. Dolan also testified that an individual who was restricted from exposure to unruly, demanding, or obnoxious customers would not be able to perform either the sales attendant or cashier jobs.

C.    THE ALJ's DECISION

The ALJ issued a written decision on July 5, 2005, concluding that Dickey was not disabled within the meaning of the Social Security Act because she was capable of performing past relevant work. A.R. at 13-22. In reaching this conclusion, the ALJ followed the five-step analysis set out in 20 C.F.R. § 404.1520. The analysis requires a sequential evaluation of:

(1) whether claimant is engaged in substantial gainful activity; (2) the severity and duration of claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents claimant from doing her past relevant work; and (5) whether claimant can perform other work, given her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. <u>Young v. Barnhart</u>, 362 F.3d 995, 1000 (7th Cir. 2004).

The ALJ determined that Dickey met her burden on the first two steps of the analysis, noting that Dickey's history of ligament damage, obesity, mild degenerative joint disease, and non-severe depression in combination constituted a severe impairment. The ALJ concluded that Dickey failed to demonstrate that her impairment was severe enough to equal an impairment listed on Appendix 1. The ALJ then considered whether Dickey retained the residual functional capacity to perform her past relevant work (step four). The ALJ found that Dickey's claims of disability were not fully credible or

consistent with the record evidence.  He noted that "[s]he has received fairly regular treatment for her combined impairments but has minimal arthritic findings on x-ray and has not been prescribed any potent prescription pain relievers."  A.R. at 19.  The ALJ noted that Dickey "had good results with wrist surgery, working for several years thereafter."  Id.  The ALJ recognized that Dickey reduced her work to part-time, at a lighter level, but noted that she had requested full-time work at Wal-Mart but none was available.  The ALJ found that Dickey's more recent complaints of pain centered on her knee and back, with minimal objective findings.  The ALJ noted that, despite complaints of pain, Dickey remained physically active.  The ALJ recognized that no treating or examining medical source opined that Dickey was unable to work and that the state reviewing medical sources concluded that Dickey could perform light work.

The ALJ similarly concluded that Dickey's allegations of severe depression and mood disorder were not credible.  The ALJ noted that Dickey had a noted excellent response to psychotropic medication, maintained normal interest in daily activities, read as a hobby with no indication of notable limitation in concentration, and had no history of decompensation.

The ALJ concluded that Dickey retained the residual functional capacity to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand /walk or sit about six hours in an eight-hour work day.  The ALJ found that Dickey could only occasionally climb stairs and never climb ladders, ropes or scaffolds, but could otherwise frequently engage in all postural activities.  The ALJ concluded that Dickey had only mild restriction in activities of daily living, social functioning, and concentration.  He noted no prior episodes of decompensation.  The ALJ concluded that Dickey's past relevant work as a small product assembler and checker did not require the performance of work-related activities that were precluded by her residual functional capacity.  In doing so, the ALJ noted Dolan's testimony that Dickey could perform such work as defined by the Department of Labor, even if she could not perform the work as she described it.  Therefore, the ALJ concluded that Dickey was not disabled at step four, and her claim for DIB was denied.

D.   THE APPEALS COUNCIL

Dickey appealed the ALJ's decision to the SSA Appeals Council, asserting that the decision was not based on substantial evidence and was contrary to the law.  A.R. at 12.  On November 16, 2005, the Appeals

Council denied Dickey's request for review, stating that it found "no reason under [its] rules to review the Administrative Law Judge's decision." Id. at 5. Thus, the ALJ's decision became the final decision of the SAA. Dickey then filed her Complaint (d/e 1) in the present case on December 22, 2005. This case was originally assigned to United States District Judge Richard Mills. By Text Order, dated June 8, 2007, the matter was reassigned to this Judge.

## ANALYSIS

This Court will reverse the decision of the SSA if that decision is not supported by substantial evidence or results from an error of law. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). This Court reviews the ALJ's factual findings to determine whether they are supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ further must at least minimally articulate his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th

Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Dickey seeks reversal of the SAA's decision, asserting that the ALJ: (1) failed to properly evaluate medical evidence regarding Dickey's leg pain,  (2) erred in finding that Dickey had no manipulative limitations, and (3) erred in finding that Dickey's depression was non-severe.  Each of these claims of error relate to the ALJ's determination of Dickey's residual functional capacity, a factual finding.  According to Dickey, the ALJ's determinations are not supported by substantial record evidence.  The Court addresses each argument in turn.

Dickey first asserts that the ALJ failed to properly evaluate medical evidence relating to Dickey's leg pain.  The ALJ determined that Dickey could stand, walk or sit for about six hours in an eight-hour work day. Dickey argues that this conclusion fails to account for the medical evidence of soft tissue necrosis in her right thigh, the radiographic evidence of foot and ankle spurs, and the mild arthritic problem in her right knee, which, when combined with her obesity, resulted in increased pain.  Dickey asserts that treating physician Dr. Allan's notes appear to support the position that,

with respect to the soft tissue necrosis, Dickey's standing on her feet in even her part-time Wal-Mart position would contribute to increasing pain. An examination of Dr. Allan's notes, however, reveals no such conclusion on the part of the doctor. Dr. Allan noted, "I am sure she thinks standing on it all day long at her job at WallMart [sic] aggravates the situation. She is interested in perhaps changing jobs, so she has a more sedentary type of job." A.R. at 188. Dr. Allan, however, rendered no opinion on Dickey's ability to stand, stating that he could not imagine doing anything surgical and prescribing Naprosyn to take "the edge off of this situation." Id. Indeed, as the Commissioner correctly points out, there is no record evidence of a treating or examining source who rendered an opinion on Dickey's functional limitations as they relate to standing. The ALJ's conclusion that Dickey could stand, walk or sit for about six hours in an eight-hour work day is supported, however, by the state medical examiners' Physical Residual Functional Capacity Assessment. Id. at 263. Moreover, Dr. Budzenski opined that the right thigh tenderness did not alter Dickey's ability to ambulate. Id. at 235. The ALJ's treatment of Dr. Allan's opinions and diagnosis does not provide a basis for remand.

The Court turns next to the evidence relating to Dickey's foot and

ankle spurs and the mild arthritic problem in her right knee.  It is well-
established that the ALJ need not evaluate in writing every piece of evidence
submitted; rather, the ALJ must sufficiently articulate his assessment of the
evidence to assure the Court that he considered the important evidence and
to allow the Court to trace the path of the ALJ's reasoning.  Carlson v.
Shalala, 999 F.2d 180, 181 (7th Cir. 1993).  As Dickey correctly points out,
the ALJ cannot ignore an entire line of evidence, as that would fall below the
minimal level of articulation required.  Id.  This is not a problem in the
instant case, however, because the ALJ expressly considered Dickey's
complaints of pain in her back and knee.  The ALJ noted that, despite the
complaints of pain, Dickey remained physically active; there were minimal
objective findings supporting the complaints, and Dickey had not been
prescribed potent pain relievers for the conditions.  The ALJ further noted
that, while Dickey was working part-time as a cashier at Wal-Mart, she
requested full-time work, but none was available.  All of these findings are
consistent with the record evidence.  Furthermore, the evidence relating to
bone spurs cited by Dickey is from July 2000, and contains no information
relating to their effect on Dickey's ability to stand.  A.R. at 143.  Dickey
fails to show that remand is appropriate based on the ALJ's assessment of

her residual functional capacity as it relates to her ability to sit, stand, or walk.

Dickey next asserts that the ALJ's determination that she had no manipulative limitations lacks support in the record. Dickey contends that the ALJ inconsistently concluded that Dickey's ligament damage to the right hand was severe at step two of his analysis, yet failed to include any functional limitation resulting from it in his determination of Dickey's residual functional capacity. However, as the Court has noted, at step two, the ALJ determined that Dickey's history of ligament damage, obesity, mild degenerative joint disease, and non-severe depression in combination constituted a severe impairment. A.R. at 21. There is no inconsistency.

Additionally, the ALJ's conclusion that Dickey had no manipulative limitations is supported by the record evidence. Dickey last saw Dr. Wilhelmi in July 2002, at which point he noted her job change but concluded that clinically Dickey had done well following surgery. There is no indication in the record that Dickey sought further treatment for her wrist after this examination. Furthermore, there is no record evidence that any treating or examining source opined as to any manipulative limitations. The ALJ's conclusion is supported by the state medical examiners' Physical

Residual Functional Capacity Assessment, which noted no manipulative limitations.  <u>A.R.</u> at 265.  Dickey points to the dynamometer testing results set out in Dr. Budzenski's report.  <u>Id.</u> at 234.  Dr. Budzenski's report, however, deals only with grip strength and does not address manipulative limitations.  Indeed, Dr. Budzenski concludes by noting that Dickey has a "very excellent range of motion" and no atrophy in her hands.  <u>Id</u>. at 235.  Moreover, even Dickey herself did not state that manipulative problems prevented her from performing her cashier job.  Rather, she testified that she quit her job at Wal-Mart because she was experiencing pain while standing.  Dickey fails to show that remand is appropriate based on the ALJ's determination that she did not have manipulative limitations.

Finally, Dickey contends that the ALJ's finding that Dickey's depression was non-severe is not supported by the medical evidence of record.  The ALJ determined that Dickey's allegations of severe depression or a mood disorder were not credible.  Clearly, the ALJ must base his determinations on testimony and medical evidence in the record and "not succumb to the temptation to play doctor . . . ."  <u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th Cir. 1996).

Dickey asserts that there is no medical evidence in the record

indicating that she does not have a severe mental impairment.  This is unpersuasive because, as previously noted, Dickey bears the  burden at step four of showing that she has a severe impairment that impairs her ability to work.  There is no record evidence from any medical source opining that Dickey's mental impairments impede her ability to work.  Dickey attempts to meet her burden by pointing to her October 2003 GAF of 50 and the fact that her last psychiatric treatment note from October 2004 indicates that her husband reported Dickey to be very stressed.  The Court notes that the GAF of 50 was assigned not by Dr. Woerner, but rather by an individual identified as an MS/QMHP Intake Coordinator.  Furthermore, it was assigned in October 2003, prior to Dickey's receiving any psychological treatment.  Taken as a whole, the psychiatric treatment notes and testimony presented support the ALJ's determination that Dickey's mental impairments did not severely limit her ability to work.  On all accounts, the psychiatric treatment notes reveal that Dickey responded well to treatment and medication.  At the time of the hearing, Dickey had discontinued counseling and only saw her psychiatrist every six months in order to get her medication.  Even at the October 2004 follow-up, when Dickey's husband described her as "very stressed," Dickey stated that her mood had been

pretty good most of the time.  A.R. at 261.  Dr. Woerner did not note any limitation on Dickey's ability to work, and he consistently noted Dickey's ability to babysit for four children, including five-year-old twins, mentioning that Dickey loved babysitting and that Dickey's daughter paid her "some" for the babysitting.  Id. at 259-61.  This is not a case of the ALJ playing doctor and substituting his opinion for that of a medical source.  The ALJ's determination that Dickey's depression was non-severe is supported by substantial record evidence.  Remand is not appropriate on this basis.

THEREFORE, for the reasons set forth above, Plaintiff's Motion for Summary Judgment (d/e 8) is DENIED and Defendant's Motion for Summary Affirmance (d/e 11) is ALLOWED.  The decision of the Commissioner of Social Security is AFFIRMED.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:  July 24, 2007.

FOR THE COURT:

_____s/  Jeanne E. Scott_____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE